[Cite as *In re I.J.*, 2016-Ohio-1037.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 15AP-894 |
| [I.J.], | : | (C.P.C. No. 12JU-355) |
| [S.C., | : | (ACCELERATED CALENDAR) |
| Appellant]. | : | |
| In the Matter of: | : | |
| | | No. 15AP-895 |
| [D.C.], | : | (C.P.C. No. 12JU-356) |
| [S.C., | : | (ACCELERATED CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on March 15, 2016

**On Brief:** *William T. Cramer*, for appellant. **Argued:** *William T. Cramer*

**On Brief:** *Robert J. McClaren*, for Franklin County Children Services. **Argued:** *Robert J. McClaren*

APPEALS from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

BRUNNER, J.

{¶ 1} Appellant, S.C., mother of minor children, I.J. (born June 2003) and D.C. (born September 2005), appeals a decision of the juvenile division of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch that granted permanent custody of both children to Franklin County Children Services ("FCCS"). Because we find this decision was not against the manifest weight of the evidence, we affirm.

Nos. 15AP-894 and 15AP-895

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   This case is not the first instance in which FCCS has sought and obtained temporary custody of I.J. and D.C. (collectively "the children").  This particular case commenced January 10, 2012, with a complaint for child abuse, neglect, and dependence as to D.C. and a complaint for dependency as to I.J. FCCS alleges in its complaint that S.C. had bitten D.C.'s face and pushed her face into a sink, loosening one of D.C.'s teeth and causing a large welt on her head, because D.C., at six years old and further diagnosed with attention deficit disorder ("ADD"), was not getting ready for school quickly enough. The complaint included information that S.C. has convictions for solicitation and domestic violence (amended to disorderly conduct) and has been involved with FCCS dating back to 2003.  The complaint indicates that neglect was substantiated in 2004, physical abuse was substantiated in 2010, and sexual abuse was also indicated in 2010.[1]  The same day, the court issued an emergency care order removing D.C. and I.J. (who were then respectively six and eight years old) from S.C.'s home.  The following day, the court formally awarded temporary custody of both children to FCCS.

{¶ 3}   The court granted extensions of temporary custody on November 20, 2012 and again on May 10, 2013, to provide S.C. with an opportunity to demonstrate that she could carry out parenting skills and anger management skills that she had been required to improve through programs and training, as well as meeting necessary milestones to show that she could care appropriately for her children.  Despite these efforts by the trial court and FCCS, on August 28, 2013, FCCS found it necessary to file a motion for permanent custody of the two children.

{¶ 4}   On July 21, 2014, the trial court commenced a hearing on the question of permanent custody.  The following parties appeared at the trial court's hearing: (1) FCCS appeared through an attorney; (2) a guardian ad litem ("GAL") appeared for the children with an attorney; (3) the children were also separately represented by counsel; (4) D.C. and I.J.'s biological father appeared through counsel; and (5) S.C. appeared through counsel. Though the biological father appeared through counsel, he explicitly elected to let the case proceed uncontested.

---

[1] One of the witnesses from FCCS testified in this case that "substantiated" as an FCCS term of art means that something is confirmed to have happened, and "indicated" means there is enough evidence to say that something likely happened but it is not certain. (July 29, 2015 Tr., 12-13)

{¶ 5}   S.C. testified first during the hearing as upon cross.  She testified that, as of the date of the hearing, D.C. was 8 and I.J. was 11, and neither of the children was then living with her.  She said they were taken from her because of allegations of abuse on her part "supposedly," and on unproven allegations that her brother (uncle to the children) had "messed with" her daughter. (July 21, 2014 Tr., 21.)  Despite implying that she had not abused D.C., S.C. admitted that she pled guilty to domestic violence because she smacked her daughter in the mouth when her daughter told her she was not going to brush her "f'ing" teeth. (July 21, 2014 Tr., 27.)  She also testified that her brother had been accused of sexually abusing her children but that FCCS had found such allegations were unsubstantiated and that she had only learned of such allegations shortly before the hearing.  S.C. had difficulty explaining why, if this was so, FCCS had continually insisted she move away from her brother's neighborhood and why her brother's proximity to the children was a concern.  As of the date of that hearing, S.C. admitted that she still resided near her brother.  S.C. also admitted that her sole source of income was social security ($741 per month) and food stamps ($186) per month.  Before the hearing could proceed toward completion, the trial court had to continue the matter because of the illness of counsel.

{¶ 6}   Before the hearing was rescheduled, in December 2014, S.C.'s counsel requested and was granted leave to withdraw after citing irreparable conflict with S.C. and continuing health concerns.  The trial court appointed new counsel, and after several more months, in July 2015, the hearing resumed.

{¶ 7}   On the first day of the continued hearing, July 27, 2015, the next witness testified, Richard Goeke, Ph.D.  Dr. Goeke is a psychologist and expert witness who evaluated D.C., I.J., and S.C.  Dr. Goeke testified that he diagnosed D.C. with chronic post-traumatic stress disorder ("PTSD") and an adjustment disorder with mixed disturbance of emotions and conduct  He also noted that she was previously diagnosed with attention deficit disorder.  Dr. Goeke said D.C. revealed to him that she had been sexually abused by two adults (her uncle and a boyfriend of her mother's) and two teen (or possibly pre-teen) cousins.  D.C. also confirmed that she had been physically abused by her mother and that her mother had banged her head against a sink.  Dr. Goeke recounted that D.C. had discontinued visits with her mother and expressed positive views about

finding a "forever family" through adoption. (Sept. 10, 2015 Decision, 15.) He saw no evidence that D.C. had been coached to respond to his questioning and evaluation in the ways that she did.

{¶ 8} With respect to I.J., Dr. Goeke testified that I.J. has chronic PTSD, borderline intellectual functioning, and hears voices (though he opined that these voices are likely a vivid imagination's reaction to trauma rather than a sign of psychosis). I.J. confirmed that his uncle sexually abused both him and his sister, D.C. In addition, I.J. told Dr. Goeke that his biological father had permitted I.J. and his sister, D.C., to watch his father have sexual intercourse with his girlfriend and that I.J. and his sister had also engaged in mutual sexual behavior. Dr. Goeke explained that I.J. and his sister were at the time of the hearing in separate foster placements to avoid sexual acting out between them. Dr. Goeke testified that I.J. wants to return to his mother but would also not mind being adopted by his foster father.

{¶ 9} Dr. Goeke testified that S.C. has borderline intellectual functioning, and his report indicated a probable I.Q. of around 70. Dr. Goeke also testified that S.C. has a personality disorder. Dr. Goeke's addendum to his initial evaluation summarized findings relating to S.C. in this way:

> Test results indicated an individual with a personality style marked by narcissistic and paranoid features. Individuals who obtain a similar profile may be defensive about admitting their mistakes or failures, hypersensitive to criticism, feel special or entitled, expect special favors without being reciprocal, and have a low level of empathy and insight. Such persons may be self-deceptive and easily derive reasons to justify self-centered or inconsiderate behavior. She may have difficulty accepting the ideas of others. She may seem suspicious and distrusting of others, relate in a somewhat distant manner, and be concerned about being harmed or taken advantage of by others. All of these traits can cause interpersonal conflict. Similar individuals can appear stubborn, inflexible, and slow to forgive others at times. She may express angry feelings and later feel guilty.

(FCCS exhibit No. 6, at 9.) According to Dr. Goeke, S.C. was not convinced that the children had actually been abused while in her care. She evinced instead the belief that abuse of some kind may have happened in one of the foster homes; although, neither of the children made such allegations relating to their foster care. Dr. Goeke testified that

S.C. could not adequately provide a stable home for her children so that they would be protected from abuse at her hands and the hands of others.

{¶ 10} A licensed counselor who counsels D.C., George Goodman, was the next witness to testify. He largely confirmed Dr. Goeke's testimony about D.C., stating that she has PTSD and is in need of a loving, supportive, and stable environment if she is to work through her PTSD issues.

{¶ 11} FCCS then called S.C. again as upon cross to update the testimony she had given during the first day of the hearing in July 2014. S.C. testified that in the time since the prior hearing she has had another child and that, with an FCCS action pending, she had acceded to the juvenile court granting custody of that child to S.C.'s aunt. S.C. admitted that she now believed the allegations of sexual abuse against her brother and was not sure about what to think of allegations of sexual abuse against a previous boyfriend but testified that she did not believe Dr. Goeke's testimony that, for example, D.C. had PTSD as a result of the time she spent in S.C.'s care. According to S.C., by the time of the continued hearing date, she had moved away from her brother's neighborhood. However, she admitted that her electricity had been turned off for some months due to a conflict over bills with her ex-boyfriend and that the same ex-boyfriend had been coming around her house, fighting with her, and had even ripped the screen door off the house.

{¶ 12} The next two witnesses were the caseworkers who were responsible for the case during the years dating back to 2010. The current caseworker testified that she recommended that permanent custody be granted to FCCS. A prior caseworker testified that the goal to reunify must yield at some point to the children's need for a permanent stable home. Both testified that, although S.C. had made progress on the case plan at times and had taken the courses on parenting, anger management, and other topics that had been recommended to her, S.C. had not by the hearing date demonstrated a consistent ability to apply those teachings and has never fully acknowledged the abuse she inflicted and allowed other people, such as her brother, to inflict upon D.C. and I.J.

{¶ 13} A number of examples vividly illustrate the caseworkers' statements. According to one caseworker, S.C. commented that she thought D.C. should be polygraphed to determine whether she was telling the truth about having been sexually

abused.  Yet, S.C. also told one of her caseworkers that her brother had sexually abused her, too, but she did not think "he was still like that." (July 28, 2015 Tr., 193-94.)

{¶ 14} Shortly before the second extension of temporary custody was granted, S.C. had been doing well and FCCS had been considering returning custody to her.  Then S.C. entered the hospital to have surgery during a weekend visit and left the children with her mother and the uncle who had sexually abused them.  The details of what occurred during that weekend have never come to light but, following the weekend, I.J. had a black eye and both children regressed in their treatment and began wetting themselves.  In addition, when they visited S.C. in the hospital, S.C. was verbally abusive to the point that hospital staff would not allow her to be in the room with the door closed with her children, ultimately had security escort the children out of the building away from S.C., and notified FCCS.

{¶ 15} As a final example, during one visit, S.C. allowed D.C. to play with her electronic tablet.  When D.C. began to use the tablet, pornographic materials appeared on the screen.  The location of the visit lacked cellular and Wi-Fi service, so D.C. could not have accessed anything that was not already loaded on the tablet.  Yet, S.C. blamed D.C. and became angry with her for accessing the material.

{¶ 16} According to the current caseworker, both D.C. and I.J. had been in the temporary custody of FCCS for 42 months as of the hearing date. Placement had been difficult because D.C. and I.J. have special needs; as of the hearing date, D.C. had had eight placements and I.J. had seven.   Though initially, the children were placed together, they were separated because they were acting out sexually with each other.  The biological father had not been involved in the case for a long time as of the date of the hearing, and neither child was bonded to him.  The caseworker testified that S.C. is bonded to the children but the children do not feel that S.C. will keep them safe.  The caseworker further stated that I.J., despite wanting to move back with S.C., is concerned that S.C. will allow her abusive brother around him and D.C.  Though initially D.C. wanted to reunify with her mother, the caseworker testified that as of the date of the hearing, D.C. no longer wanted to reunify and was having flashbacks to her mother physically abusing her as well as sexual abuse from her uncle and mother's ex-boyfriend.

{¶ 17} The then current caseworker testified that I.J. is bonded to his present foster family and that they are willing to adopt him. The caseworker explained that, although D.C. is not in a foster home that is willing to adopt, an adoptive home can be recruited for her. Despite the lack of a current adoptive placement, in the four to five months prior to the hearing, D.C. expressed to the GAL for the children that she was frightened of her mother and that she wanted to be adopted, even knowing that her current home would not be adopting her.

{¶ 18} The final witness to testify in FCCS' case-in-chief was the GAL for the children. The GAL testified that he was initially supportive of reunification and tried to help S.C. by advising her to move away from her brother into new income-based housing that an agency had found for her. He advised her to take this placement even if it meant she could not take her dog with her, because having her children was more important. However, over time the GAL observed that, while S.C. will do the right thing if someone is watching, her behavior when she believes no one will find out is quite different. For instance, D.C. reported to the GAL that during one visit where she and S.C. found themselves alone in the bathroom, S.C. threatened to kill D.C. if D.C. persisted in allegations of sexual abuse against S.C.'s current boyfriend and the rest of the alleged sexual abusers. According to the GAL, D.C. no longer wants to return to her mother and is scared of her. I.J., however, still wants to live with his mother. The children are bonded to each other and, although S.C. does a sub-optimal job raising the children, there is some sort of bond between her and the children also. I.J. is also bonded to his current foster family. The GAL further noted, consistent with the testimony of other witnesses and Dr. Goeke's evaluation that S.C. flies off the handle with little provocation.

{¶ 19} The only witness to testify in S.C.'s case-in-chief was a parent mentor and case manager who had worked with S.C. through a program called Ohio Guidestone to help her learn parenting skills. She testified that S.C.'s admitted abuse had occurred in the past but expressed a wish to do better. The parent mentor explained that S.C.'s discipline as she observed it was likely too lax, as S.C. was attempting to gain the children's loyalty and affection. She testified that S.C. keeps a watchful eye on her children, that she does a good job rewarding and building self-esteem in the children, and that she always prepares healthy food for the children. The parent mentor had not

observed anything in family members that she thought would pose a threat to the safety of the children and testified that S.C. herself tends to respond to stress passively by crying and retreating from the situation. On cross-examination she admitted, however, that S.C. had not yet completed the Guidestone program and that S.C. had more to learn in particular about keeping the children safe by not having dangerous male companions. She also admitted that S.C. has a weakness as a parent in that she has low cognitive abilities.

{¶ 20} Finally, the GAL, though he was not subjected to questioning by any of the attorneys present, delivered an oral report and recommendation. While acknowledging that S.C. loves the children and that S.C. has made some positive changes in her life, including getting a part-time job, the GAL ultimately testified that it would not be in his ward's interest (or the interests of the children) for them to be returned to S.C.'s care, testifying that S.C. is not equipped to deal with the challenge of raising D.C. and I.J.

{¶ 21} Following the hearing, on September 10, 2015, the trial court issued a decision and judgment entry granting permanent custody of both D.C. and I.J. to FCCS. S.C. now appeals.

## II. ASSIGNMENT OF ERROR

{¶ 22} S.C. offers one assignment of error for review:

> **Assignment of Error:** The trial court erred in finding clear and convincing evidence to support a finding that it is in the best interest of the children to terminate the parental rights of appellant.

## III. DISCUSSION

{¶ 23} When proceeding under R.C. 2151.414(B)(1), a decision to award permanent custody requires the trial court to take a two-step approach. First, the trial court must find whether any of the following apply:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child

cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a) through (e).

{¶ 24} Then, once the trial court finds that one of these circumstances is present, the trial court then must determine whether, "by clear and convincing evidence," the movant has shown that a grant of permanent custody is in the "best interest of the child." R.C. 2151.414(B)(1). Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt. *Id.*

{¶ 25} In this case it is undisputed that both I.J. and D.C. "were in the custody of the agency for twelve months out of a consecutive twenty-two-month period" in accordance with R.C. 2151.414(B)(1)(d). (S.C.'s Brief, 32.) Thus, the analysis focuses on whether it was "in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody." R.C. 2151.414(B)(1). R.C.

2151.414(D) sets forth relevant factors to consider in determining the best interests of the children:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). The additional factors referenced in R.C. 2151.414(D)(1)(e) are:

> (7) The parent has been convicted of or pleaded guilty to one of [a number of offenses apparently inapplicable in this case].
>
> * * *
>
> (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(7) through (11).

{¶ 26} In reviewing a trial court's decision as to whether the statutory elements are satisfied in a permanent custody case, we must not reverse unless the decision is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * * , declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its effect in inducing belief."

*Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's Law Dictionary*, 1594 (6th Ed.1990).

Nos. 15AP-894 and 15AP-895

### A. Factor (D)(1)(a) – Relationship Between Children and Biological Parents, Siblings, and Foster Parents

{¶ 27} Our review of the record reflects that I.J. is bonded to his mother and would like to return to her. But he is also bonded to his foster family which is prepared to adopt him. According to the current caseworker, I.J. apparently harbors doubts about his mother's ability to keep him and his sister safe if they are returned to her.

{¶ 28} Though a bond of some sort between D.C. and her mother existed in the past and still may exist, D.C. has indicated that she is scared of her mother and does not want to return to her. D.C. is bonded to her current foster family but understands that she will be separated from them at some point after the matter of permanent custody is decided. However, D.C. wishes to be adopted and is excited at the prospect of finding a permanent adoptive placement family.

{¶ 29} The children are bonded to one another, but they had to be separated because they were acting out sexually with each other.

{¶ 30} Neither child is bonded with their biological father, and it has been a long time since the father was involved in the case. The father has elected to let this matter proceed uncontested.

{¶ 31} Our review of the record in this case comports with the trial court's analysis of this statutory factor relating to what is in the best interests of the children. Reviewing the trial court's findings on the evidence concerning this factor, we cannot say that its decision is against the manifest weight of the evidence.

### B. Factor (D)(1)(b) – The Wishes of the Children

{¶ 32} The trial court's decision reflects that it interviewed both children, and both interviews are part of the record.

{¶ 33} In the interview, in the presence of counsel and of the trial judge, D.C. repeated her allegation that S.C. had threatened to kill her in the bathroom during a visit and again reaffirmed her wish to be adopted. In addition, when the trial judge asked if there was anything else she should know when making a decision, D.C. volunteered that her uncle, her mother's boyfriend, and her cousins had all sexually abused her. She also volunteered that she never wants to see her mother again; her mother hit her, bit her, pulled her hair, and slammed her head into the sink.

Nos. 15AP-894 and 15AP-895

{¶ 34} In I.J.'s interview, I.J. indicated that his wish is to go back home, qualified by his defining home as "[w]ith my mom being safe." (Aug. 7, 2015 Tr., 9.) I.J. said he had no concerns about safety with his mom. He explained that this was because he felt that he and his sister would no longer see or be near their uncle.

{¶ 35} The GAL for the children expressed the view that the motion for permanent custody should be granted for the good of his wards. He testified:

A. You know, Your Honor, this - - this case has been such that we've been on it since 2012. In the beginning, I was all for reunification of the children with mother. It became apparent as the years progressed that it wasn't about if [S.C.] could do the things that was asked of her when somebody was watching, you know, she could go down and she'd check off the list and do - - and do those things, but it was about what she would do when no one was watching.

And after the incidences at the hospital, incidences of choosing appropriate housing that the other agencies worked so hard to get her to and her deciding not to - - to go forward with it at that time, I started to realize that even though, you know, [S.C.]'s a - - she's a likeable person, I mean, you had a tendency [to] feel sorry for her, okay. But in the best interests of these children, my recommendation would be to turn, you know, to grant the PCC so that these kids have a chance to move forward in their lives. [S.C.] will always be their mother and that's sometim' that no one can take away, but you know, [I.J.]'s 12 we got, six years before he ages out. We got a real shot here with both of these children to help turn around something in their lives to where it would be - - be good for them and they can get redirected with - - with parents that would care and nurture them and help them to return back to people that could, you know, be good for society. So I don't feel these children feel safe even though it's been more adamant with [D.C.] here lately and when you talk to [I.J.] it's not, he still wants to go home with mother, but sometimes I feel that you - - it's, you know, it's hard for someone to make a decision and sometimes I know I look back at my own life, I was glad that even though I thought I should do something this way, someone much older, much more smarter than me at the time had my best interest and made the decision for me and I can only look back now and say, you know what, that was a good thing at the time. I'm glad - - I'm glad somebody did that for me. I've agonized over this. I - - I've - - I've agonized a lot. I - - I know it's not easy, but I can sleep well at

Nos. 15AP-894 and 15AP-895

> night knowing that that's my recommendation. I have no regrets or no ill thoughts different, different wise.
>
> Q. And you would ask the Court to grant the motion for permanent custody?
>
> A. I would ask the Court to grant the motion for the PCC on both children, yes.

(July 30, 2015 Tr., 7-9.)

{¶ 36} The trial court in its decision accurately recounted the history of this case and the children's wishes, and thus, we hold that the trial court's findings on this factor are not against the manifest weight of the evidence.

## C. Factor (D)(1)(c) – The Children's Custody History

{¶ 37} Though not directly confronted in this case, the record suggests that FCCS has been involved with this family since at least 2010 and possibly as far back as 2003. For example, one of the caseworkers who testified in this case was also the caseworker in a prior case with this family. She testified that, beginning in October 2010, she obtained the case when S.C. was being criminally charged for having given I.J. a black eye. Shortly thereafter, FCCS obtained temporary custody of both children when D.C. alleged sexual abuse against her uncle. That initial case was closed on October 20, 2011, and I.J. and D.C. were returned to S.C. Yet, within three months, FCCS was forced to obtain custody of the children again when, in early January 2012, S.C. bit six-year-old D.C. on the face and smashed her head against a sink. Both D.C. and I.J. have been in the temporary custody of FCCS since that time.

{¶ 38} Accordingly, we hold that it was not against the manifest weight of the evidence for the trial court to have concluded that the record clearly and convincingly showed that the children's history with the agency militated in favor of granting the motion.

## D. Factor (D)(1)(d) – The Children's Need for Secure Placement and Whether that Can be Achieved without Granting Custody to FCCS

{¶ 39} There was considerable testimony to the effect that S.C. has been cooperative with FCCS in going to trainings and attempting to learn good parenting techniques. However, there was also considerable testimony to the effect that she has been inconsistent actually using those techniques when attempting to parent I.J. and D.C.

{¶ 40} Of greater concern, however, is that in each instance S.C. has been given the opportunity to interact with her children free from outside oversight, she has not protected them from harm and has exhibited abusive behavior. In October 2011, her children were returned to her. After less than three months they were again removed from her care and custody when she bit six-year-old D.C. on the face and smashed the child's head against the sink. When, after that incident, S.C. had progressed enough in the case plan to be permitted to host the children for unsupervised overnight visits, she left them for a weekend under the same roof with a man the children repeatedly accused of having sexually abused them and whom she admitted to a caseworker had previously sexually abused her. I.J. received a black eye during that weekend, and both children regressed in therapy and had episodes of wetting their pants thereafter. Even just a few months before the hearing, when S.C. happened to be alone with D.C. in a bathroom during a supervised visit, she told D.C. that she was going to kill her if she did not stop making allegations of sexual abuse against S.C.'s current boyfriend and the rest of the alleged sexual abusers.

{¶ 41} As the GAL for the children stated, "It became apparent as the years progressed that it wasn't about if [S.C.] could do the things that was asked of her when somebody was watching, you know, she could go down and she'd check off the list and do - - and do those things, but it was about what she would do when no one was watching." (July 30, 2015 Tr., 7.) It was not against the manifest weight of the evidence for the trial court to have found S.C. not to be a suitable caregiver for her children, I.J. and D.C.

{¶ 42} No other relative will take custody of these children. Their biological father has not been involved in the case for some time and chose not to contest the permanent custody motion. FCCS investigated other relatives but found none willing and able to care for adopt I.J. or D.C.

{¶ 43} At the time of the trial court's decision on September 10, 2015, I.J. was 12 and D.C. was 10. The opinion of the children's GAL is that the children need and deserve a stable home for at least a few years of their remaining childhood before becoming adults. The trial court's findings on the children's needs for secure placement and that that goal cannot be achieved without awarding them to FCCS, were not against the manifest weight of the evidence.

Nos. 15AP-894 and 15AP-895

### 1. Factor (E)(7) – Convictions of Parents

{¶ 44} As previously noted, the biological father of the children has not contested the permanent custody motion and does not currently seek custody. Hence, his convictions (or lack thereof) are not relevant, and the record does not reveal information about the children's biological father on this subject. Although the record does contain evidence of convictions against S.C. related to the abuse allegations concerning D.C. and I.J., none of the offenses for which S.C. was convicted is listed or similar to those listed in R.C. 2151.414(E)(7). Thus, the trial court appropriately accorded this factor no weight.

### 2. Factors (E)(8-9) – Risk of Harm from Drug or Alcohol Abuse and Withholding Food or Medical Treatment

{¶ 45} Our review of the record shows the trial court correctly determined that neither factors relating to risk of harm from drug or alcohol abuse and withholding food and medical treatment play a role in this case.

### 3. Factor (E)(10) – Whether the Children have been Abandoned

{¶ 46} Concerning whether I.J. and D.C. have been abandoned, as noted, the biological father in this case, has been uninvolved for quite some time and indicated that he was not opposing the motion for permanent custody at the start of the July 2014 hearing. Accordingly, he has abandoned I.J. and D.C., and the trial court's finding in this regard was not against the manifest weight of the evidence.

{¶ 47} S.C. has contested this case throughout and has been active in seeking custody of her children. Hence, she has not abandoned them, and the trial court was correct in concluding that she had not abandoned her children.

### 4. Factor (E)(11) – Whether Parents have had Parental Rights Involuntarily Terminated with Respect to a Sibling of D.C. and I.J.

{¶ 48} The record in this case reflects that S.C. relinquished custody of her youngest daughter, a third child, following a complaint by FCCS. However, the particular circumstances of this termination of custody are insufficient to conclude that termination of custody was involuntary. Thus, the trial court appropriately concluded that on the record before it, this factor did not play a role.

### E. Overall Weighing of the Factors and the Best Interest of the Children

{¶ 49} In summary, based on our review of the law, the record, and the trial court's decision, we find that the trial court appropriately considered the evidence according to

the statutorily required considerations and properly granted FCCS' motion for permanent custody of I.J. and D.C. The relationship between the children and their father is, at this point, nonexistent, while the relationship with their mother is and has been intermittently loving and dangerous to their physical and mental well-being. That the children must be separated for permanent placement is a consequence of the children's compulsion to act out sexually based on the sexual abuse they have suffered. While I.J. has stated that he would like to return to live with his mother if it is in safety, he is bonded to his potential adoptive family and has also stated that he would be pleased to be adopted by them in the event he is not returned to his mother. D.C. never wants to even see her mother again and, though she does not yet have an adoptive family, she wishes to be adopted and looks forward to it. The need for secure placement is apparent in this case, as these children only have six and eight years, respectively, before they age out of childhood. No relative of the children is willing and able to care for or adopt them. Despite S.C.'s stated intentions that she is willing to parent and care for her children, she has repeatedly demonstrated that she is unable to keep them safe and to provide for their well-being without continual and constant oversight.

{¶ 50} Under these circumstances, it was not against the manifest weight of the evidence for the trial court to have concluded that, by clear and convincing proof, awarding permanent custody to FCCS is the appropriate outcome. Accordingly, S.C.'s sole assignment of error is overruled.

## IV. CONCLUSION

{¶ 51} Because we find that the trial court's analysis of the factors and ultimate outcome were not against the manifest weight of the evidence, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch granting permanent custody to FCCS.

*Judgment affirmed.*

DORRIAN, P.J., and KLATT, J., concur.